UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBRA PRATT,

        Plaintiff,

        v.                                                  Case No. 22-C-568

WISCONSIN ALUMINIUM FOUNDRY,

        Defendant.

---

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

        Plaintiff Debra Pratt filed this employment discrimination action against her former employer, Defendant Wisconsin Aluminum Foundry (WAF). The complaint asserts three separate Title VII claims: discriminatory discharge, pay discrimination, and retaliation. The court has jurisdiction pursuant to 28 U.S.C. § 1331. Before the court is WAF's motion for summary judgment. For the following reasons, the motion will be granted, and the case will be dismissed.

## BACKGROUND

        Ms. Pratt was hired by WAF as an HR/benefits administrator in August 2016, with an annual salary of $55,000. She initially reported to HR Manager Jim Behnke. Ms. Pratt's duties included validating invoices for benefits, entering information for dental plans, and running reports for pensions. Mr. Behnke left WAF in February 2017 and Ms. Pratt was promoted to fill the HR Manager position. As HR Manager, she reported to Ben Jacobs, WAF's Senior Vice President and Chief Product Officer. Mr. Jacobs set Ms. Pratt's annual salary, which was increased to $65,016 when she became HR Manager. Mr. Jacobs made the decisions to increase Ms. Pratt's salary on January 1, 2018, and to award her a performance bonus for 2017. Ms. Pratt's annual

salary increased to $69,567.12 effective January 1, 2018. She also received a bonus of $9,000 for her 2017 performance.

Throughout 2018, however, several incidents occurred that called into question Ms. Pratt's performance. In January 2018, Controller Jody Rabitz and payroll clerk Lisa Novachek pointed out numerous errors regarding plan numbers for employees in a master spreadsheet of benefits deduction information. HR was responsible for preparing the spreadsheet and ensuring that it matched the enrollment sheets before the payroll department would enter deductions. Pratt Dep. 63:16–65:25, Dkt. No. 33-1. Ms. Rabitz explained that "we cannot afford for the information to not line up because screens aren't coordinating correctly," and Ms. Pratt agreed that HR needed to avoid those errors. Def.'s Proposed Findings of Fact (DPFOF) ¶ 51, Dkt. No. 32; Pratt Dep. 65:12–25. Ms. Pratt personally admitted responsibility for it, stating "I must have deleted a row but only a partial row causing everything to be off." Pratt Dep. 64:12–15.

That same month, Ms. Rabitz sent another email to Ms. Pratt questioning a number of details in the master spreadsheet and describing the process as very confusing, to which Ms. Pratt responded by acknowledging making several mistakes during the process. DPFOF ¶¶ 52–53. Ms. Rabitz described the process for Health Savings Account (HSA) contributions in January 2018 as being disorganized and not working for the Payroll Department. *Id.* ¶ 54. Ms. Rabitz questioned why the HR employees did not work on a Saturday to ensure data was accurate given its critical nature. *Id.* ¶ 55. In April 2018, Ms. Novachek questioned Ms. Pratt as to why she had not caught a January rate change for insurance premiums, which another employee caught, and the error would be ongoing if that employee had not caught it. *Id.* ¶ 56.

In February 2018, Maintenance Manager Rick Redeker presented Mr. Jacobs with a four-page document Mr. Redeker had found on the copy machine in the HR work area. *Id.* ¶ 33. This

2

document contained notes of an apparent investigation into various allegations of verbal abuse of some employees by others in December 2017 and February 2018. Dkt. No. 33-1 at 183–86. There was also discussion of drug screens and drug use, complaints about special treatment for some employees, and what were called "sexual innuendos" between Eugene Boyd, Vice President of Operations, and Material Manager Lili Goehring. According to an unidentified witness designated "Witness 1," Ms. Goehring had come into a morning meeting a couple of weeks earlier and said she fell and bruised her "butt." Witness 1 stated that Mr. Boyd told her to get up on the table and show everyone. Sometime previously, according to Witness 1, Mr. Boyd was alleged to have put his thumb on the table, stuck it up, and told Ms. Goehring to "sit on it and he would spin her." *Id.* at 185. Other witnesses who were at the meeting did not corroborate Witness 1's account of the two incidents but one, designated "Witness 2," stated "there was [sic] some people complaining about the behavior between Lilly [Goehring] and Eugene [Boyd] but it does not seem to bother Lilly." *Id.*

WAF hired a third-party investigator, Amy D. Hartwig of GO Management Solutions, to determine the author of the document, how Mr. Redeker obtained the document, and the veracity of the allegations contained in the document. DPFOF ¶ 35. Unaware that a third-party investigation was happening, Ms. Pratt sent Mr. Jacobs a report that appeared to be a revised version of the same document Mr. Redeker had found. *Id.* ¶¶ 36, 39. In the revised report Ms. Pratt sent to Mr. Jacobs, the account provided by Witness 2 corroborated Witness 1's statement that Mr. Boyd invited Ms. Goehring to "get up on the table and show everyone." Dkt. No. 33-1 at 187. Ms. Pratt also included in her revised report the following "finding" about the interaction between Mr. Boyd and Ms. Goehring:

> Lastly, the biggest concern of all is that of sexual harassment. While at this point in time, it appears to be of a joking nature between participants. However, this is still

3

unprofessional and against the law. It is also important to recognize that any witnesses to this have the ability to file a sexual harassment complaint with the company as well as the EEOC and with the statements that were received this would be a difficult case to defend.

*Id.* at 188.

In fact, it appears that Ms. Goehring and Mr. Boyd were joking about Ms. Goehring's statement that she had slipped and "bruised her ass." Neither had made any complaint about the other and Ms. Pratt only learned of the incident when she was investigating an allegation by another employee that he had been told by four people that a different co-employee had called him "every name in the book." Dkt. No. 33-1 at 187. Ms. Pratt had made her "finding" without interviewing either Mr. Boyd or Ms. Goehring.

After interviewing Mr. Boyd, Ms. Goehring, and the other witnesses to the incident, Ms. Hartwig concluded that Ms. Pratt was the author of the document that Mr. Redeker had found, that several people who should not have seen the confidential information in the document saw it because it was left unattended and was not properly safeguarded, and that Ms. Pratt's handling of the document showed a lack of experience and sound judgment because she prematurely and inappropriately made factual and legal conclusions without conducting a full and fair investigation into the facts. DPFOF ¶¶ 43–44. Ms. Pratt denied that she had left the document in the printer and thought Mr. Redeker had taken it from her desk. She nevertheless acknowledged that it was problematic to leave the document on the printer and understood why WAF would be concerned that Mr. Redeker obtained a copy of the document. *Id.* ¶¶ 42, 45–46. As a result of Ms. Hartwig's investigation, Ms. Pratt was given training on how to conduct and document investigations, and Mr. Boyd and Ms. Goehring received training to address their conduct. *Id.* ¶¶ 47–48.

In July 2018, WAF retained a consulting group, Utech, to assist in creating a strong and stable future for the organization. *Id.* ¶ 70. As part of its consulting project, Utech interviewed 51

4

WAF leaders and employees, including Pratt. *Id.* ¶ 71. Utech provided the WAF Board of Directors a document titled "Feedback Themes and Trends," reflecting general themes that were articulated by more than five individuals during interviews, not attributed to any specific individual. *Id.* ¶¶ 72–73. The Utech report, which is dated September 27, 2018, offered strengths and concerns for each of the managers. *Id.* ¶¶ 76–77. With respect to Ms. Pratt, the report stated, "[s]he has not built trust with many in the organization. Many see Deb as having her own agenda, focusing on investigating people and making issues more dramatic than necessary. She is also feeding into the culture of gossip instead of being the one to stop it." Dkt. No. 33-1 at 205.

Ms. Pratt received an overall performance rating of 10 out of 32 in her 2018 Employee Performance Appraisal, which was prepared by Mr. Jacobs and delivered to Ms. Pratt on December 7, 2018. DPFOF ¶¶ 78–79. Ms. Pratt's overall performance led Mr. Jacobs to give her a zero rating for conducting herself with honesty, integrity, and a high level of business ethics, believing that, under Ms. Pratt's management, HR was not a safe confidential place for the organization like it was supposed to be. *Id.* ¶ 80; Jacobs Dep. 60:4-20, Dkt. No. 33-2. When she received the 2018 performance appraisal, Ms. Pratt told Mr. Jacobs that she felt like she had been retaliated against since bringing forward concerns of sexual harassment by Mr. Boyd in February 2018. DPFOF ¶ 83. In a February 22, 2019 email to Board Member Laurie Herzog, Ms. Pratt wrote that she felt she was targeted after February 2018. *Id.* ¶ 84. On March 7, 2019, Ms. Pratt sent an email to Mr. Jacobs questioning various portions of the 2018 Employee Appraisal and stating in reference to the February 2018 investigation into Mr. Boyd: "[I]t is my perception that you do not like me and feel this is directly related to the events in February and due to my inability to turn a blind eye to those events . . . . I was participating in a protected activity in February 2018, and I feel I have suffered retaliation on a repeated basis as a result." *Id.* ¶ 86.

5

Mr. Jacobs and Board Member Lutsky met with Ms. Pratt on March 15, 2019, to terminate her employment. *Id.* ¶ 95. Mr. Jacobs testified that he and Ms. Lutsky determined they needed to make a change in the HR leadership because of Ms. Pratt's ongoing performance deficiencies, including, for example, difficulties in her day-to-day job responsibilities, other employees' lack of trust in her, the results of the investigation circumstances surrounding her leaving a confidential report in the office copying machine, the results of the Utech Report, and the challenges caused by her failure to follow the proper process for hiring for a union position. *Id.* ¶ 96. Michelle Szymik was hired to replace Ms. Pratt. *Id.* ¶ 97.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). In deciding a motion for summary judgment, the court must view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that

party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Title VII Termination Claim

Ms. Pratt claims that she was terminated from her position as HR Manager at WAF because of her sex. It is, of course, her burden to show that sex was the motivating factor in WAF's decision to terminate her employment. In Title VII discrimination claims, "the test 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).'" *Id.* (quoting *Ortiz*, 834 F.3d at 766). The court will employ that framework because the parties rely on *McDonnell Douglas* as "a means of organizing, presenting, and assessing" evidence. *Id.* "[U]nder *McDonnell Douglas*, the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Id.* at 225 (internal quotation marks and citation omitted). If the plaintiff can establish a *prima facie* case, the burden then shifts to the employer to articulate "a legitimate, nondiscriminatory reason for the adverse employment action," after which a plaintiff only prevails if she shows that the explanation is pretextual. *Id.*

7

At the outset, the court finds that Ms. Pratt waived her discriminatory discharge claim because her arguments focus solely on the alleged retaliation. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). The meat of Ms. Pratt's argument is that she was terminated because she investigated a complaint that Mr. Boyd had engaged in sexually harassing conduct. She states that "there is reason to doubt any issue other than Ms. Pratt's investigation into Eugene Boyd was responsible for her negative performance review." Dkt. No. 36 at 5. According to Ms. Pratt, her poor performance review was due to her investigation of Mr. Boyd, and when she "complained that her negative review was given to her in retaliation for her Title VII protected reporting, [she] was fired a week later." *Id.* at 7. This amounts to an argument in support of her retaliation claim, not in support of discriminatory termination on the basis of sex.

In addition to waiver, Ms. Pratt's discriminatory discharge claim fails because the undisputed evidence establishes that she was not meeting WAF's legitimate performance expectations. As noted above, Controller Jody Rabitz and payroll clerk Lisa Novachek pointed out numerous errors regarding plan numbers for employees in a master spreadsheet of benefits deduction information in January 2018. DPFOF ¶ 51. That same month, Ms. Rabitz sent another email to Ms. Pratt questioning a number of details in the master spreadsheet and describing the process as very confusing, to which Ms. Pratt responded by acknowledging making several mistakes during the process. *Id.* ¶¶ 52–53. Ms. Rabitz described the process for Health Savings Account (HSA) contributions in January 2018 as being disorganized and not working for the Payroll Department. *Id.* ¶ 54. In April 2018, Ms. Novachek questioned Ms. Pratt as to why she

8

had not caught a January rate change for insurance premiums, which another employee caught, and the error would be ongoing if that employee had not caught it. *Id.* ¶ 56.

Ms. Hartwig's third-party investigation into the circumstances surrounding the confidential investigative report left in the copying machine and the Utech Report to management provides further support for WAF's determination that Ms. Pratt was not meeting the expectations of her employment. Ms. Pratt had concluded from her investigation of an entirely unrelated complaint that Mr. Boyd had sexually harassed Ms. Goehring without even interviewing either of them, and then left her confidential report containing that "finding" in a copy machine to which other employees had access. Dkt. No. 33-1 at 167, 188. Based on her independent investigation, Ms. Hartwig concluded that, not only had Ms. Pratt's drafting and handling of her report shown a lack of experience and sound judgment, but she had "prematurely and inappropriately made factual and legal conclusions without conducting a full and fair investigation into the actual facts." *Id.* at 167.

The Utech Report likewise provides support for WAF's contention that Ms. Pratt was not meeting performance expectations. Ms. Pratt does not deny that Utech concluded from its interviews with her co-employees that she had not built trust with many in the organization, that she was seen as having her own agenda, focusing on investigating people and making issues more dramatic than necessary, and that she was feeding into the culture of gossip instead of being the one to stop it. Instead, she argues that other managers also were criticized, yet none were terminated and instead they received bonuses. DPFOF ¶ 77. She contends, instead, that she "was disciplined and fired for the same issues that her male peers had without consequence." Dkt. No. 36 at 4.

Unfortunately, she does not offer any specific evidence supporting her assertion. An assertion, unsupported by evidence that employees with the same performance issues were not

9

fired, does not overcome a motion for summary judgment. *See Oliver v. Amazon.com Servs., LLC*, No. 22-CV-149, 2023 WL 5953197, at *8 (E.D. Wis. Sept. 13, 2023) ("while [plaintiff] makes passing reference in her brief to her being terminated due to her sex[,] . . . her brief contains no argument connecting her termination to her alleged sex discrimination"). Moreover, a careful reading of the Utech Report reveals that none of the other employees evaluated by Utech had the same or even a similar position as Ms. Pratt and, as to each, the strengths and concerns set out in the report were significantly different than for Ms. Pratt. Dkt. No. 33-1 at 199–205.

Mr. Jacobs also testified that, in addition to the documented issues described above, he had personally received complaints from numerous employees that they did not trust Ms. Pratt. DPFOF ¶ 60. He testified he "couldn't walk through the foundry without many random workers expressing their concern with the direction of the HR department was going." *Id.* ¶ 61. Mr. Jacobs also considered the complaints about the HR Department from the Finance Department when completing renewals under the Affordable Care Act and noted that the HR Department was seen as a major contributor to the rumor mill. *Id.* ¶¶ 64–65.

Ms. Pratt objects to much of this evidence as hearsay. It is not offered to prove the truth of the matter asserted, however, but to show what information Mr. Jacobs received and acted upon. The official and informal reports Mr. Jacobs received therefore do not constitute hearsay. *See* Fed. R. Evid. 801(c)(2). Nor does Ms. Pratt's disagreement with these assessments create an issue of fact. "[I]t is the perception of the decisionmaker, not the employee, that is relevant." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398–99 (7th Cir. 1998) (citing *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir. 1996)). In deciding a motion for summary judgment in a discriminatory discharge case under Title VII, the court is not concerned with whether the employer's decision was right or wrong; rather, the court is concerned solely

with whether the reason for which the employer discharged the employee was discriminatory. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

The undisputed facts before the court make clear that WAF articulated reasons for discharging Ms. Pratt that were well supported by the evidence before the company and were not forbidden by law. No evidence has been submitted that even suggests the decision to terminate Ms. Pratt was on account of her sex. Ms. Pratt has failed to present evidence that any similarly situated employee was treated differently. WAF is therefore entitled to summary judgment on her claim for discriminatory discharge.

### B. Title VII Pay Discrimination Claim

Ms. Pratt's pay discrimination claim also fails. She has failed to identify any similarly situated employees outside the protected class who were treated more favorably than her as to compensation. To establish this element, Pratt must identify "someone who is directly comparable to [her] in all material respects except for membership in the protected class." *Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). "A similarly situated employee need not be 'identical,' but the plaintiff must show that the other employee 'dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

For purposes of pay discrimination, Ms. Pratt identifies only Emery Coonen as a comparator. Emery Coonnen was hired as the Environmental Health & Safety (EHS) Manager in May 2017, at an annual salary of $85,328.43. DPFOF ¶ 23. She argues that both of their roles had a comparable scope of responsibilities, that both had a similar amount of experience,

11

education, and qualifications, that Mr. Jacobs was involved in setting both of their salaries, and that Ms. Pratt had more management responsibility because she had direct reports. The record does not support her contention.

Mr. Coonen's overall job responsibilities included anticipating, assessing, and addressing operational safety, environmental risks, and safety opportunities to improve the conditions of WAF's workforce and the company's footprint in both the community and environment. *Id.* ¶ 26. Specifically, Mr. Coonen was responsible for developing and administering various environmental, health, and safety plans and procedures for all WAF personnel; planning, organizing, and controlling all activities of the safety department; identifying risks and implementing plans and procedures for mitigating risk; performing Job Safety Analysis and implementing procedures to support employee safety; and measuring and recording environmental data for DNR-EPA Compliance. *Id.* ¶ 27. In other words, he held a very different position from the one Ms. Pratt held.

It is true that Ms. Pratt's predecessor, Mr. Behnke, was responsible for environmental health and safety, in addition to his HR responsibilities. *Id.* ¶ 29. But in July 2017, Ms. Pratt updated the HR Manager job description to remove the EHS responsibilities because that became Mr. Coonen's job. *Id.* ¶ 31. Based on the new job description, Mr. Coonen and Ms. Pratt shared only two responsibilities out of the 15 essential functions of the HR Manager: responding to OSHA if they visited the company and attending meetings related to the company's worker's compensation plan, which only occurred up to five times a year. *Id.* ¶ 32.

The inference of discrimination may be stronger if the same decisionmaker set their salaries because "[d]ifferent decisionmakers may rely on different factors." *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826–27 (7th Cir. 2008). Here, however, the undisputed facts establish that

Mr. Jacobs set Ms. Pratt's salary, while the executive team, of which Mr. Jacobs was only a member, set Mr. Coonen's salary. Thus, even if Mr. Jacobs is a member of the executive team, the team as a whole may have relied on different factors than if Mr. Jacobs had set Mr. Coonen's salary by himself.

The undisputed facts show that Mr. Coonen and Ms. Pratt had different job duties and reported to different supervisors. This is fatal to her claim. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (plaintiff "fails in her attempts to show that [alleged comparators] are similarly situated because neither [comparator] held the same position as [plaintiff], nor did they have similar job responsibilities"). As such, Ms. Pratt has failed to show that Mr. Coonen, as EHS Manager, was similarly situated to her. Because Ms. Pratt cannot establish a *prima facie* case in her pay discrimination claim, the court's inquiry ends there, and WAF need not articulate a legitimate, nondiscriminatory reason for failing to pay her more. WAF's motion for summary judgment on Ms. Pratt's pay discrimination claims will therefore be granted.

### C. Retaliation Claim

There are "two methods through which a claimant may prove a *prima facie* retaliation claim: the 'direct' method and the 'indirect' method." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "The direct method requires the plaintiff to simply present evidence satisfying the elements of the retaliation claim: (1) he engaged in a protected activity, (2) he suffered an adverse action, and (3) a causal connection exists between the activity and the adverse action." *Id.* (citation omitted). The indirect method "allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and

13

(4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Id.*

Only the direct method is at issue here. Ms. Pratt argues that there is a direct causal link between her alleged protected activities and her termination. She does not point to a similarly situated comparator that was treated more favorably. The court will therefore analyze her claim as a direct method claim. The dispute centers on the first and third elements of the claim.

Ms. Pratt claims that her "investigation into Boyd was responsible for her negative performance review." Dkt. No. 36 at 5. She further contends that her poor 2018 performance review was due to her investigation of Mr. Boyd, and when she "complained that her negative review was given to her in retaliation for her Title VII protected reporting, [she] was fired a week later." *Id.* at 7. Ms. Pratt adds that she reported similar concerns about the way Mr. Boyd and others treated women to Mr. Jacobs. WAF argues in response that Ms. Pratt's report on Mr. Boyd's conduct was not protected, given her position as HR Manager and, in any event, she is unable to establish a causal relation between her alleged protected conduct and her termination.

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This general prohibition has two distinct clauses that give rise to two distinct claims: a participation clause and an opposition clause. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 747 (7th Cir. 2010). "The participation clause prohibits retaliation against an employee who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Hatmaker*, 619 F.3d at 747. "A purely

14

internal investigation does not involve a 'charge,' or testimony, and neither is it a 'proceeding' or a 'hearing.'" *Id.* Since there was no Title VII charge, Ms. Pratt's claim can arise, if at all, only under the opposition clause.

The opposition clause protects an employee who opposes "any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In *Crawford*, the Supreme Court held that the term "oppose" "carries its ordinary meaning: [t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand." 555 U.S. at 276 (internal quotations and citations omitted). Quoting an EEOC Guideline, the Court noted, "'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" *Id.*

Application of this definition poses significant difficulties when the plaintiff in a retaliation case is, like Ms. Pratt, the employer's human relations manager. This is because the job responsibilities of a person who works in the human relations department is to investigate and report discrimination within the company by which she is employed. As one employer described the problem:

> allowing personnel officers to bring retaliation claims under the opposition clause based on complaints lodged in connection with their official duties would create an automatic prima facie case of retaliation for any terminated human resources or EEO employee. Since such employees' daily work involves reporting on claims of discrimination in ways that could be construed as "opposing" discrimination, Defendants reason that any adverse action taken against those employees would likely be in close proximity to such opposition and could consequently risk embroiling an employer in gratuitous litigation.

*Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015).

In response to the defendant's argument and consistent with *Crawford*, the Second Circuit held in *Littlejohn* that "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself

is not a protected activity under § 704(a)'s opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII." *Id.* More is required. Such an employee has engaged in protected conduct, the court held, if the employee "actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer." *Id.* (internal quotations and brackets omitted). Moreover, "[the] opposition, to be protected by the statute, must be based on a good-faith (that is, honest) and reasonable belief that it is opposition to a statutory violation." *Hatmaker*, 619 F.3d at 747. A plaintiff claiming retaliation "must not only have a subjective (sincere, good faith) belief that [she] opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000). As the court explained in *Mattson v. Caterpillar, Inc.*, "Title VII was not designed to arm employees with a tactical coercive weapon under which employees can make baseless claims simply to advance their own retaliatory motives and strategies." 359 F.3d 885, 890–91 (7th Cir. 2004) (internal quotations omitted).

In this case, Ms. Pratt's investigative report on Mr. Boyd was not protected activity because the conduct she was investigating did not involve prohibited discrimination under Title VII. The EEOC Guidelines define "sexual harassment" to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (citing 29 CFR § 1604.11(a) (1985)). "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* (citing 29 CFR § 1604.11(a) (1985)); *see also Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir. 2005) ("Sexual horseplay differs from sex discrimination, and Title VII covers only discriminatory

16

conduct."). Ms. Pratt knew at the time she made her report that Mr. Boyd's remarks to Ms. Goehring were not unwelcome.

Moreover, sexual harassment must be severe and pervasive and must have occurred because of the allegedly harassed person's sex. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016). Here, regardless of the impropriety of Mr. Boyd's joke, it was an isolated instance and there is no evidence that it was intended to harass Ms. Goehring. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011) (finding the complained-of conduct was not harassment when it was "a single instance of sexually-charged remarks which, however imprudent they may have been, were relatively tame"). Even the person that first reported the incident that Ms. Pratt wrote up denied that sexual innuendos between Mr. Boyd and Ms. Goehring were "constant" and acknowledged that they went both ways. Dkt. No. 33-1 at 176.

Alternatively, WAF argues that Ms. Pratt cannot establish causation. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Therefore, to survive summary judgment, Ms. Pratt must present evidence from which a reasonable jury could find that WAF terminated her *because of* her complaints regarding discrimination. *Id.* Ms. Pratt contends that WAF terminated her because she complained about not receiving a bonus in retaliation for protected activity. However, there is no evidence that Mr. Boyd was involved in the decision to terminate Ms. Pratt's employment, or that Mr. Jacobs took issue with Pratt's investigation into Mr. Boyd. Further, the March 7, 2019 email in which Ms. Pratt complained about not receiving a bonus was not itself protected activity because, as explained above, the underlying complained-of activity did not constitute harassment, nor did she take any step to oppose discrimination with her email. Accordingly, even if being fired only a week after she sent the email is generally indicative of

causation, Ms. Pratt cannot provide a causal link between her firing and any protected activity. Instead, more than a year passed from the time that Ms. Pratt conducted her statutorily protected investigation into Mr. Boyd's conduct and her termination. When "substantial time lapse[s] between the protected activity and the adverse employment action [there] is counter-evidence of any causal connection." *Filipovic v. K & R Express. Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999). Thus, Ms. Pratt cannot establish causation and WAF's motion for summary judgment on Ms. Pratt's retaliation claim will be granted.

## CONCLUSION

For these reasons, WAF's motion for summary judgment (Dkt. No. 30) is **GRANTED** and the case is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 22nd day of April, 2024.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge